# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 02-3226

_____

United States of America,            *
                                       *

     Plaintiff-Appellee        *
                                       *   Appeal from the United States

v.                                *   District Court for the Western
                                     *   District of Missouri

Robert F. Yockel, Jr.,       *
                                       *

     Defendant-Appellant   *

_____

Submitted: January 14, 2003
Filed: February 21, 2003

_____

Before WOLLMAN and MURPHY, Circuit Judges, and GRITZNER,[1] District Judge.

_____

GRITZNER, District Judge.

On this appeal, appellant Yockel asserts the district court[2] erred in (1) not holding intent was a requirement for the intimidation element of bank robbery; (2) finding the evidence was sufficient to prove the taking of money by intimidation; (3) precluding defendant from presenting evidence regarding intent and mental

_____

[1]The Honorable James E. Gritzner, United States District Judge for the Southern District of Iowa, sitting by designation.

[2]The Honorable Fernando J. Gaitan, Jr., United States District Judge for the Western District of Missouri, Western Division.

health; and (4) failing to grant a continuance or mistrial, requested after the jury was impaneled and sworn, when the court reversed its ruling on the government's motion in limine regarding the admissibility of defendant's mental health evidence. We affirm.

On March 23, 2001, appellant entered UMB Bank located at 14th and Grand in Kansas City, Missouri. He appeared a little dirty and scraggly, his hair was unkempt, and his eyes were black as if he had been beaten. He approached a bank teller and stated that he wanted to withdraw $5,000 from his account. He could not provide an account number, so the teller asked him for identification. Yockel provided his Kansas driver's license, but the teller could not find an account under Yockel's name or social security number.

When the teller asked if the account could be under another name, Yockel told her to look under "Bob Yockel", "Drug Bust", "Evangelistic Services", and "Triple X Deluxe". The teller was unable to find an account under any of these names, and she then sought help from her manager. They still could not find an account for Yockel, and the teller repeatedly told him that she could not find an account for him.

The teller asked Yockel in which branch of the bank he had opened his account; Yockel stated he didn't know. The teller then explained, "I'm sorry, I can't help you." Yockel replied, "Well, I know I have money here." Searching computer records once again, the teller turned the computer screen so Yockel could see it, saying, "There's nothing here," then gave Yockel his identification back.

As Yockel was putting his license away, he asked the teller, "Does it matter to you if you go to heaven or hell?" The teller responded, "Yeah, I'd kind of like to go to heaven." Yockel again asked, "Do you want to go to heaven or hell?" The teller does not recall what her response was. Yockel then told her, "If you want to go heaven, you'll give me the money."

Upon hearing Yockel's statements regarding heaven and hell, the teller became fearful for her life, pondered whether her son would have a mother, and wondered where she would go when she died. She became so frightened, she urinated.

The teller decided to give Yockel some money in the hopes that he would leave her teller window. She grabbed two bundles of $100 bills and one bundle of $50 bills and gave Yockel the cash, amounting to $6,000. When the teller asked Yockel, "How's that?", he responded, "That's great, I'll take it."

During this encounter, Yockel did not, at any time, make any sort of physical movement toward the teller and never presented her with a note demanding money. Yockel never displayed a weapon of any sort, never claimed to have a weapon, and by all accounts, did not appear to possess a weapon.

Tanya Moore, an unarmed security guard on duty that day, noticed Yockel leave the teller line and saw the teller crying and pointing to Yockel as he left the bank. Moore followed Yockel outside, saw Yockel in a car with two other people, and noticed that Yockel was counting money. As Moore approached the car asking if everything was alright, the car drove off. Inside the bank, the teller had now pulled the alarm, but Yockel was not apprehended.

The following day, Yockel visited a different UMB Bank, this one located at 1810 Grand in Kansas City. Yockel approached a teller window and tried to withdraw funds, providing his driver's license to the teller. The teller informed Yockel that he could not obtain money without his account number, to which Yockel replied that he had been able to obtain "money down the street yesterday" without an account number. While this was taking place, another teller recognized Yockel as possibly having robbed the 14th Street UMB Bank the day before and called the police. The police arrived and arrested Yockel.

Yockel was charged in a criminal complaint with bank robbery in violation of 18 U.S.C. § 2113(a). Following a psychological examination, a competency hearing was held before a magistrate judge. The only evidence to which both parties would stipulate was the psychological report which concluded that Yockel was competent to understand the nature and consequences of the proceedings against him and to assist properly in his defense. The magistrate judge recommended that the district court find Yockel competent to stand trial. There being no objection by the parties, the district court found Yockel competent to understand the nature and consequences of the proceedings against him and to properly assist in his defense.

On July 24, 2001, Yockel had filed a notice of intent to rely on the defense of insanity. On November 19, 2001, Yockel withdrew the notice of his intent to rely on insanity and expert testimony at trial, but maintained his intention to present evidence of his mental health "through other evidentiary sources." During the pretrial conference, Yockel advised the government and the court that he intended to rely on the defense of general denial and lack of intent.

The case against Yockel was scheduled for trial on February 4, 2002; however, on that date, because Yockel had indicated he intended to offer medical records, personnel records, and lay testimony regarding his history of mental problems and mental treatment, the government filed a motion in limine seeking to preclude such evidence since Yockel was not relying on the defense of insanity. The trial was continued to allow the court time to fully consider the matter. In its motion, the government contended that whether Yockel intended to intimidate the teller was irrelevant, and that the essential issue was whether Yockel did something that would make an ordinary person fear bodily harm.

Yockel contended that the general intent of bank robbery requires proof that he possessed knowledge with respect to the *actus reus* of the crime and that the use of force or intimidation is part of the *actus reus* of bank robbery. On February 13,

2002, the district court denied the government's motion in limine. The court found that medical evidence was admissible, not on the issue of Yockel's intent but, rather, on the issue of Yockel's knowledge of his actions, i.e., whether he knew he was physically taking money that did not belong to him. The February 13, 2002, order made it clear that this evidence was relevant and admissible only with respect to Yockel's knowledge of his actions, not his intent.

On the morning of the first day of trial, counsel for Yockel explained to the court that he planned to offer copies of medical records reflecting Yockel's mental health but was not going to offer expert testimony; he intended to present the medical records without a witness. The trial court advised Yockel's attorney that he would not be allowed to present evidence regarding mental illness or mental health in this fashion, and that the court denied the motion in limine on February 13, 2002, expecting Yockel to present expert testimony. The district court and counsel continued to address this issue after jury selection and before opening statements, but, ultimately, the trial court ruled that it was going to exclude mental health evidence in its entirety as not relevant to any issue in the case. The court rescinded its order of February 13, 2002, and granted the government's motion in limine. Appellant moved for a mistrial and a continuance; both motions were denied, and the case proceeded with a two-day jury trial in which Yockel was convicted on Count I of the superceding indictment.

I.    **Application of the mens rea element of bank robbery to the element of intimidation.**

"Analysis of the intent element under § 2113(a) is an issue of law," United States v. Sewell, 252 F.3d 647, 650 (2nd Cir. 2001), which we review de novo. United States v. Yousif, 308 F.3d 820, 827 (8th Cir. 2002). Likewise, issues of statutory construction are reviewed de novo. United States v. Allen, 247 F.3d 741, 757 (8th Cir. 2001), *vacated and remanded by* 122 S. Ct. 2653, 153 L. Ed. 2d 830,

70 U.S.L.W. 3798 (U.S. 2002); see also United States v. Williams, 136 F.3d 547, 550 (8th Cir. 1998).

In addressing the issue of whether bank larceny (18 U.S.C. § 2113(b)) was a lesser-included offense of bank robbery (18 U.S.C. § 2113(a)), the Supreme Court indicated that the offense of bank robbery prohibited by § 2113(a) "contains no explicit *mens rea* requirement of any kind." Carter v. United States, 530 U.S. 255, 267 (2000). The statute of conviction for Yockel, 18 U.S.C. § 2113(a)[3], requires only proof of "*general intent* – that is, that the defendant possessed knowledge with respect to the *actus reus* of the crime (here, the taking of property of another by force and violence or intimidation)." Id. at 268 (emphasis in original).

The court in Carter, discussing a hypothetical situation, specifically pointed out that "[s]ection 2113(a) certainly should not be interpreted to apply to the hypothetical person who engages in forceful taking of money while sleepwalking (innocent, if aberrant activity), but this result is accomplished simply by requiring . . . general intent – i.e., proof of knowledge with respect to the *actus reus* of the crime." Id. at 269 (emphasis in original). Similarly, this court has previously found that the first paragraph of § 2113(a) does not require specific intent as an element of the offense. See United States v. Johnston, 543 F.2d 55, 58 (8th Cir. 1976).

Thus, in the instant case, the government maintains, the *mens rea* for the *actus reus* of bank robbery is satisfied by proof that Yockel knew he was physically taking money. The contrary position Yockel assumes is that the government had to prove

---

[3]Section 2113(a) provides, "Whoever, by force and violence, or by intimidation, takes, or attempts to take, from the person or presence of another, . . . any property or money or any other things of value belonging to, or in the care, custody, control, management, or possession of, any bank . . ." has committed the crime of bank robbery.

he knowingly intimidated the teller in order to have been convicted of the March 23, 2001, UMB Bank robbery.

The Fourth Circuit has analyzed the issue of what *mens rea* requirement must accompany the *actus reus* of bank robbery under § 2113(a). See United States v. Woodrup, 86 F.3d 359 (4th Cir. 1996). In that case, Woodrup had been convicted of bank robbery under § 2113(a). Id. at 360. The Fourth Circuit specifically rejected Woodrup's argument that in order to have convicted him of bank robbery, the government was required to prove he intended to intimidate the victim. Id. at 363-64. In rejecting Woodrup's argument, the Fourth Circuit explained,

> The statute merely requires that a theft of money from a bank be "by force or violence, or by intimidation" in order to constitute robbery; nothing in the statute even remotely suggests that the defendant must have intended to intimidate. . . . We therefore reaffirm that the intimidation element of section 2113(a) is satisfied if "an ordinary person in the teller's position reasonably could infer a threat of bodily harm from the defendant's acts," whether or not the defendant actually intended the intimidation.

Id. at 364 (citations omitted in original).

Likewise, in United States v. Foppe, the defendant argued that he could not be convicted under 18 U.S.C. § 2113(a) unless the government proved "that he specifically intended to intimidate . . . the [bank] teller mentioned in the indictment." United States v. Foppe, 993 F.2d 1444, 1451 (9th Cir. 1993). Foppe had requested a jury instruction that would have required the government to prove beyond a reasonable doubt that he "intentionally and voluntarily used force or violence on, or intimidated" the teller in order to take the money. Id. Instead, the trial court gave an instruction that the government need only prove that "the taking was either by force and violence, or by intimidation." Id.

The Ninth Circuit, in Foppe, pointed out that "[u]narmed bank robbery, as defined in section 2113(a), is a general intent crime, not a specific intent crime." Id. (citing United States v. Burnim, 576 F.2d 236, 237 (9th Cir. 1978)). "[T]he jury can infer the requisite criminal intent from the fact that the defendant took the property of another by force and violence, or intimidation." Id. (referring to United States v. Porter, 431 F.2d 7, 10 (9th Cir. 1970)).

The Foppe court noted that "[t]he determination of whether there has been an intimidation should be guided by an objective test focusing on the accused's actions." Id. (quoting United States v. Alsop, 479 F.2d 65, 67 n.4 (9th Cir. 1973)). Therefore, "[w]hether Foppe specifically intended to intimidate [the bank teller] is irrelevant." Id. In light of this, the Ninth Circuit found that the jury instruction given by the district court "adequately described the elements of the offense." Id.

In this circuit, "intimidation", as it is used in § 2113(a), is also determined by an objective standard. See United States v. Caldwell, 292 F.3d 595, 596 (8th Cir. 2002); see also United States v. Smith, 973 F.2d 603, 604 (8th Cir. 1992). "Intimidation is conduct reasonably calculated to put another in fear . . . [measured objectively by] an ordinary, reasonable person [standard]." Id. (quoting Smith, 973 F.2d at 604).

As intimidation is measured, in this circuit, under an objective standard, whether or not Yockel intended to intimidate the teller is irrelevant in determining his guilt. We find, as did the Woodrup and Foppe courts, that "the intimidation element of section 2113(a) is satisfied if 'an ordinary person in [the teller's] position reasonably could infer a threat of bodily harm from the [Yockel's] acts,' *whether or not* [Yockel] actually intended the intimidation." See Woodrup, 86 F.3d at 364; see also Foppe, 993 F.2d at 1451 (emphasis added). The district court correctly concluded the mens rea element of bank robbery did not apply to the element of intimidation and properly excluded evidence on that issue.

## II.     Motion for judgment of acquittal.

The district court has very limited latitude when considering a motion for acquittal.  United States v. Hernandez, 301 F.3d 886, 889 (8th Cir. 2002).  "In ruling on a motion for judgment of acquittal, the role of the district court is not to weigh evidence or consider the credibility of the witnesses, but rather to determine whether the government has presented evidence on each element sufficient to support a jury verdict."  United States v. Chavez, 230 F.3d 1089, 1091 (8th Cir. 2000).  When considering a motion for judgment of acquittal, the court must "view the evidence in the light most favorable to the guilty verdict, giving the government the benefit of all reasonable inferences that may be drawn from the evidence."  United States v. Basile, 109 F.3d 1304, 1310 (8th Cir. 1997).  "After reviewing the evidence under these standards, we will reverse only if we conclude that no reasonable jury could find guilt beyond a reasonable doubt."  Id.

Yockel argues there was insufficient evidence to establish that his conduct during the banking transaction constituted intimidation as a matter of law.  As previously indicated, the law of this circuit clearly establishes that intimidation is to be determined by an objective standard.  In the present case, the teller testified that at the bank Yockel appeared dirty and had unkempt hair, and eyes that were blackened, as if he had been beaten.  Having been told several times that no information on an account could be found, Yockel asked "Does it matter to you if you go to heaven or hell?"  Yockel later stated, "If you want to go to heaven, you'll give me the money."

"An oral or written demand for money accompanied with a threat of reprisal, blatant or subtle, is intended to enforce compliance by intimidation; and that intimidation accompanied by a demand for funds constitutes the crime."  United States v. Brown, 412 F.2d 381, 384 (8th Cir. 1969).  We believe Yockel's reference to the afterlife, combined with his statement "If you want to go to heaven, you'll give

me the money", would, to any reasonable bank teller, be construed as a threat, leading that teller to believe that his or her life would be in danger if the money was not turned over promptly.

This court encountered a similar scenario in Smith, where the defendant entered the bank and told the teller that he wanted to make a withdrawal. Smith, 973 F.2d at 603. When the teller informed the defendant that he needed an account in order to withdraw money, defendant responded, "no, that is not what I mean. I want to make a withdrawal. I want $2,500 in fifties and hundreds." Id. Defendant Smith acted "real fidgety", was moving around, and at one point put his elbows up on either side of the window and leaned very close to the teller so that no more than a foot separated himself and the teller. Id. at 603-04. Smith was also wearing a fanny pack which the teller feared may contain a weapon. Id. at 604. The teller stated that he was scared not only for himself, but also for the others in the bank. Id. This court concluded that the evidence was sufficient to establish the intimidation element under 18 U.S.C. § 2113(a). Id. at 605.

"Whether the defendant's actions did induce fear in an individual victim is not conclusive, but is probative of whether his acts were objectively intimidating." Caldwell, 292 F.3d at 596. In this case, the teller became so fearful that she urinated, and shortly thereafter she was also observed crying.

While it is true that during this encounter, Yockel did not display or make any reference to a weapon, we find as other courts have found that "the display of a weapon, a threat to use a weapon, or even a verbal or nonverbal hint of a weapon, is not a necessary ingredient of intimidation under § 2113(a)." United States v. Gilmore, 282 F.3d 398, 402 (6th Cir. 2002); see also United States v. Hill, 187 F.3d 698, 701 (7th Cir.1999); United States v. Henson, 945 F.2d 430, 439-40 (1st Cir. 1991).

"Unless the district court ultimately determines that a miscarriage of justice will occur, the jury's verdict must be allowed to stand." United States v. Campos, 306 F.3d 577, 580 (8th Cir. 2002). In this case, sufficient evidence was presented at trial to support a finding that Yockel did intimidate the teller. The district court did not err in denying Yockel's motion for judgment of acquittal.

## III.    Evidence regarding Yockel's intent.

Yockel insists he was not afforded a fair opportunity to present a defense in his criminal trial. As explained, Yockel did not assert an insanity defense at trial; instead, his theory of defense was based on a general denial and lack of intent to intimidate the teller. Yockel now asserts that the district court's exclusion of his medical records and certain lay witness testimony regarding his mental condition, which Yockel hoped to offer to refute the government's burden of proof on the issue of intent, denied him a fair opportunity to present a defense in his criminal trial.[4]

---

[4]In 1984, Congress enacted the Insanity Defense Reform Act, making insanity an affirmative defense. See 18 U.S.C. § 17. The statute indicates that "Mental disease or defect does not otherwise constitute a defense." Id. In the instant case, the government argues that since Yockel did not assert an insanity defense, evidence concerning his mental state is irrelevant, and inadmissible. Some circuits have allowed such evidence to be admitted, even where an insanity defense was not raised, though in the context of specific intent crimes. See, e.g., United States v. Bennett, 161 F.3d 171, 185 (3rd Cir. 1998) (discussing the affirmance of a defendant's conviction in United States v. Pohlot, 827 F.2d 889, 906-07 (3rd Cir. 1987); see also United States v. Schneider, 111 F.3d 197, 201 (1st Cir. 1997); United States v. Cameron, 907 F.2d 1051, 1064-65 (11th Cir. 1990). The Third Circuit has noted that most states limit psychiatric evidence to specific intent crimes "on the theory that mental abnormality can virtually never disprove the *mens rea* required for general intent crimes. . . ." Pohlot, 827 F.2d at 897 n.4. "Psychological evidence is relevant to *mens rea* only when the defendant is charged with a specific intent crime." Cameron, 907 F.2d at 1063 n.20 (emphasis in original).

The government presented evidence that, while at the bank, Yockel provided the names "Drug Bust", "Evangelistic Services", and "Triple X Deluxe" to the teller as she attempted to locate his account. The government presented evidence that after leaving the bank, Yockel went to a liquor store where he gave money away to strangers and paid a woman for a kiss. Evidence was offered that Yockel asked the teller questions concerning going to "heaven and hell" and the government elicited from the teller that she interpreted Yockel's comments as a threat. Yockel argues the court precluded him from presenting evidence that was crucial to rebut or explain these aspects of the government's evidence.

Yockel was allowed to present evidence through cross-examination and rebuttal testimony concerning the statements and actions he took. Yockel was able to present: that Yockel believed he had accounts and money at various banks; that he had, on multiple occasions attempted to withdraw money from other banks; that when talking to the teller, he did not refer to hell but only to heaven, and what that statement meant; that the teller believed Yockel seemed mentally unstable; that he gave away money to people because God told him to do so; that his mother took care of his daily needs; that he quit teaching in 1995 due to clinical depression; that he was a religious person; that God told him to go to banks and ask for money; that God told him he had an account at UMB Bank and that God provided him with the names to give the teller; that God told him what to say; that God told him he would be beaten; that he did not intimidate the teller and that she did not appear scared; and that he did not rob the bank.

The essence of Yockel's challenge is that he believes his history of mental illness is relevant to the jury determination of whether he intended to intimidate the teller.[5] However, as discussed, precedent clearly establishes that intimidation is

---

[5]See, e.g., Yockel's Response to Government's Motion in Limine, at p. 4 (indicating that Yockel intended to rely on evidence of his mental illness, not to

determined by an objective standard. Caldwell, 292 F.3d at 596. Moreover, intent is not an issue in bank robbery, a general intent crime, so this type of evidence was irrelevant. See Cameron, 907 F.2d at 1063 n.20 (explaining that "[p]sychological evidence is relevant to *means rea* only when the defendant is charged with a specific intent crime") (emphasis in original). Therefore, evidence regarding Yockel's intent to intimidate the teller was not relevant and was properly excluded by the district court. See Fed. R. Evid. 401, 402.

Finally, Yockel argues that the government presented testimony to establish that he was not surprised upon his being arrested, but he was not allowed to rebut this. While such evidence might be probative of whether Yockel had knowledge with respect to the *actus reus* of the crime, Yockel only points to evidence related to his mental health, evidence which, as explained, was inadmissible based on relevancy grounds. Yockel has not indicated what *admissible evidence* concerning his lack of surprise when arrested he was not allowed to present. This court will not speculate on this matter.

A district court's evidentiary rulings are reviewed for abuse of discretion. United States v. Esparza, 291 F.3d 1052, 1054 (8th Cir. 2002) (citing United States v. Becht, 267 F.3d 767, 770 (8th Cir. 2001). For the foregoing reasons, we conclude Yockel's right to due process was not violated by the exclusion of the mental health evidence.

## IV.    Continuance or mistrial.

A district court's decision to deny a motion for a continuance can be reversed on appeal only for an abuse of discretion. Morris v. Slappy, 461 U.S.1, 12 (1983);

---

suggest he was unable to form the intent to commit robbery, but solely to demonstrate that he did not intend to threaten the teller).

see also United States v. Cotroneo, 89 F.3d 510, 514 (8th Cir. 1996).  We seek to determine if the movant was prejudiced by the denial of a continuance.  United States v. Hernandez, 299 F.3d 984, 991 (8th Cir. 2002).

Similarly, "[i]t is within the discretion of the district judge to grant or deny a motion for mistrial and the decision will be reviewed only for an abuse of discretion." United States v. Encee, 256 F.3d 852, 854 (8th Cir. 2001) (citing United States v. Gladfelter, 168 F.3d 1078, 1082 (8th Cir. 1999)).  We will affirm a district court's denial of a mistrial absent an "abuse of discretion resulting in clear prejudice." United States v. Koskela, 86 F.3d 122, 125 (8th Cir.  1996).

When determining whether to grant a continuance, the relevant factors to consider include:

(1)     the nature of the case and whether the parties have been allowed adequate timing for trial preparation;

(2)     the diligence of the party requesting the continuance;

(3)     the conduct of the opposing party and whether a lack of cooperation has contributed to the need for a continuance;

(4)     the effect of the continuance and whether a delay will seriously disadvantage either party; and

(5)     the asserted need for the continuance, with weight to be given to sudden exigencies and unforeseen circumstances.

United States v. Issaghoolian, 42 F.3d 1175, 1177-78 (8th Cir. 1994).  In this case, factors (1) and (5) are the most pertinent.  Yockel's diligence has not been made an issue by the government; it does not appear from the record that the government's conduct or any lack of cooperation is relevant in determining the issue; and, while the

-14-

government might have faced scheduling concerns, it does not appear the government would have been *seriously* disadvantaged by a continuance.

In this case, the parties had nearly eleven months to prepare for trial. The indictment was filed on March 27, 2001, and the case went to trial on February 26, 2002. Yockel maintains he was forced to abandon his theory of defense (i.e. that he did not intend to intimidate the teller) immediately prior to opening statements due to the court' reversal of its February 13, 2002, order. Yockel's argument on this point is unpersuasive.

In the months leading up to trial, once Yockel indicated he would not rely on an insanity defense, the government moved in limine to preclude him from offering evidence concerning his mental health. Initially, the district court overruled the government's motion in limine, stating "that the evidence is admissible, but not on the issue of Yockel's intent. Rather, the court finds that the evidence is admissible because it goes to show Yockel's knowledge of his actions."[6] Clearly, Yockel knew, or was at least on notice, thirteen days before trial, that the court had no intention of

---

[6]See District Court's Order of February 13, 2002, at p. 5. The district court continued:

> the mental health testimony is relevant and admissible because it goes to show whether Yockel possessed knowledge with respect to the actus reus of the crime, i.e. taking money belonging to or in the possession of the bank by force or intimidation. If the expert testimony were believed, that Yockel because of his mental condition, went into the bank as an "obedient response to God's leading" and "did not demand money during the alleged bank robbery, but had simply requested to withdraw funds that he believed were his," then this would tend to negate the mens rea element of the crime.

(District Court's Order, dated February 13, 2002, at p. 7). The court went on to remind defense counsel of the restrictions of F.R.E. 704(b), indicating that any expert testimony presented at trial needed to follow those parameters. Id.

allowing this evidence to be admitted on the issue of Yockel's intent. In this situation, we conclude that Yockel had adequate time to plan a defense accordingly.

Turning to Yockel's asserted need for a continuance, giving due weight to the existence of sudden exigencies and unforeseen circumstances, Yockel's appeal fares no better. Although Yockel argues he needed a continuance in order to adequately prepare and develop a theory of defense after the court reversed its position concerning the government's motion in limine, we disagree. After nearly a year, and knowing the court would not allow evidence regarding Yockel's intent to intimidate the teller, Yockel still hoped to rely on a defense of a lack of intent. Under these facts, Yockel cannot be heard to argue the district court's change of position on the government's motion in limine created the existence of sudden exigencies or unforeseen circumstances which prejudiced Yockel's defense.

We find the district court did not abuse its discretion in denying Appellant's motion for a continuance. On the same bases, we conclude the district court did not abuse its discretion in refusing to grant a mistrial.

The proceedings of the district court are affirmed in their entirety.

A true copy.

ATTEST:

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.

-16-