# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 03-2292

_____

| | | |
|---|---|---|
| United States of America, | * | |
| | * | |
| Appellee, | * | |
| | * | Appeal from the United States |
| v. | * | District Court for the |
| | * | District of Minnesota |
| George Edward Gipson, | * | |
| | * | |
| Appellant. | * | |

_____

Submitted: February 12, 2004
Filed: September 1, 2004

_____

Before MELLOY, McMILLIAN and COLLOTON, Circuit Judges.

_____

McMILLIAN, Circuit Judge.

George Edward Gipson appeals from a final judgment entered in the United States District Court[1] for the District of Minnesota upon a jury verdict finding him guilty of two counts of bank robbery in violation of 18 U.S.C. § 2113(a). Gipson was sentenced to 78 months imprisonment on each count, to be served concurrently, and three years of supervised release. In addition, he was ordered to pay $24,551 in

_____

[1]The Honorable James R. Rosenbaum, United States District Judge for the District of Minnesota.

-1-

restitution and $200 in special assessments. United States v. Gipson, No. 01-CR-342 (D. Minn. Apr. 29, 2003). For reversal, Gipson argues that: (1) under Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993) (Daubert), the district court improperly admitted DNA evidence at trial; (2) the district court improperly admitted evidence of a witness's pretrial identification of him and her in-court identification of him; and (3) the evidence at trial was insufficient as a matter of law to support the jury's finding that he used intimidation to commit the offenses. For the reasons discussed below, we affirm the judgment of the district court.

Jurisdiction was proper in the district court based upon 18 U.S.C. § 3231. Jurisdiction is proper in this court based upon 28 U.S.C. § 1291. The notice of appeal was timely filed pursuant to Fed. R. App. P. 4(b).

## Background

The following summary of the background facts is based upon the evidence presented at Gipson's trial.

*Bank robbery on June 7, 2001*

On June 7, 2001, shortly before 3:00 p.m, a man wearing a black mask, a white shirt, blue jeans, and a black baseball cap with pink lettering entered the Firstar Bank in Hugo, Minnesota. At the time, two female tellers were working behind the counter and no one else was in the main area of the bank. The masked man walked directly to the counter, stated: "This is a robbery, get down," and vaulted over the counter. The masked man ordered the two tellers to "get on the floor," and they obeyed. He took approximately $18,000 in cash from the area behind the counter. While the tellers were on the floor, one of them began to cry. The other looked up at her and was ordered by the man to get her head down. She feared that he was going to kick

her in the head. The man placed the money in a bag, jumped back over the counter, and fled. After he left, one of the tellers triggered a foot alarm behind the counter.

Around the same time, Jean Nadeau was in her car, approaching the Firstar Bank in Hugo to deposit a check. She was unaware that the bank had been robbed. As she pulled up to the driveway of the bank, she observed a man exit the bank holding a bag. She observed the man drop his hat and stop approximately ten feet in front of her car. He was "kind of shuffling, trying to decide whether he should get his hat." Trial transcript at 199. During this time, he looked directly at Nadeau. He then left without picking up his hat. A short time later, one of the police officers responding at the scene noticed a black baseball cap with pink lettering lying on the ground in the middle of the bank driveway. The baseball cap was seized as evidence and sent to the Minnesota Bureau of Criminal Apprehension (BCA) Laboratory on June 14, 2001.

On June 13, 2001, Nadeau was interviewed by Sergeant Gary Swanson of the Washington County (Minnesota) Police Department regarding her observations on June 7, 2001, at the Firstar Bank. According to Swanson, Nadeau described the man she saw as in his mid-30s, 5'9" to 5'10", approximately 150 to 160 pounds, wearing a white shirt and blue jeans, and carrying a bag. She also stated that she believed she would recognize him if she were to see him again.

*Bank robbery on August 29, 2001*

On August 29, 2001, at approximately 1:25 p.m., a white male wearing a black mask, a green shirt, blue jeans, white latex gloves, and carrying a black bag entered the S&C Bank in Harris, Minnesota. Two female bank employees were working behind the counter, and one female bank employee was working at the front desk. The masked man ordered the three bank employees to get down on the floor, and they obeyed. He slid over the bank counter and began taking money, which he placed in

the black bag. In the process, he grabbed some bait money and triggered an alarm. He then jumped back over the counter and exited the bank.

Meanwhile, Lawrence Eckl, a volunteer firefighter, was home with his wife playing cribbage when his police scanner indicated that the S&C Bank had been robbed. Eckl, who lives close to the S&C Bank, went to his window and saw a masked man exit the bank, run down the street, and get into a red GM car. Eckl grabbed his scanner and cell phone, ran out to his truck, and began driving up and down the streets of Harris looking for the same red car.[2] When he spotted the car, Eckl drove up directly behind it and wrote down its license plate number. Eckl called the police on his cell phone, reported his observations of the suspect and the car, and continued to follow the car. At one point, the car pulled over at a corner onto the left side of the road. Eckl drove past the car slowly enough to double check the license plate number he had written down. After passing the car, Eckl began turning around, at which point the car drove off. Eckl continued to follow it in his truck. A short time later, Eckl observed the red car pull into the driveway of a game farm and stop. Eckl drove his truck alongside the red car and looked directly at the driver, who was "scrunched way down in his seat." Trial transcript at 65. After Eckl and the driver of the red car looked directly at each other, the driver sped away. During this encounter, Eckl again checked the license plate number. He attempted to continue following the car, but it was traveling too fast. Eckl called the police and again reported the license plate number of the car and the direction it was traveling when he lost sight of it.

A radio bulletin was sent out to area police to be on the lookout for a 1988 maroon Buick Skylark, license plate number 253LNJ, suspected of involvement in

---

[2]Eckl testified that approximately 850 people live in Harris, Minnesota, and the size of Harris's downtown area is approximately four square blocks. Trial transcript at 51.

the robbery of the S&C Bank.  Approximately twenty minutes later, a police officer on patrol spotted a car matching the description in the bulletin.  The officer pulled the car over and radioed for back up.  The driver, later identified as Gipson, was arrested on three outstanding arrest warrants.  No evidence of the S&C Bank robbery was found in the car.

*Photographic line-up identification*

On September 19, 2001, Sergeant Swanson prepared two photographic line-ups, each containing six photographs.  Gipson was the only person appearing in both line-ups.  One line-up contained a photograph of Gipson taken on August 29, 2001.  The other line-up contained a photograph of Gipson taken on December 17, 2000.  The August 2001 photograph showed Gipson with longer hair, a mustache, and a goatee beard.  The December 2000 photograph showed him with shorter hair and a mustache, but no beard.

On September 19, 2001, Swanson again met with Nadeau.  At his request, she again described her observations of the man in the driveway of the Firstar Bank in Hugo on June 7, 2001.  Swanson then handed her the photographic line-up containing the August 2001 photograph of Gipson and asked her if she recognized anyone.  Nadeau immediately returned the line-up to Swanson, stating that all the men in the photographs were too old and their hair was too long.

On September 25, 2001, Investigator Wayne Johnson of the Washington County (Minnesota) Sheriff's Department met with Nadeau and showed her the photographic line-up containing the December 2000 photograph of Gipson.  This time, Nadeau focused on the photograph of Gipson, but indicated that he appeared younger and heavier than the man she saw at the bank.  Johnson suggested that she imagine him older and thinner.  Nadeau then began using her fingers to cover up Gipson's hair.  Upon seeing her do that, Johnson gave her some business cards to

assist her. Nadeau thereafter positively identified Gipson as the man she saw in the driveway of the Firstar Bank in Hugo on June 7, 2001.[3]

*DNA testing*

As stated above, a black baseball cap with pink lettering was seized as evidence from the scene of the June 7, 2001, robbery at the Firstar Bank in Hugo and was sent to the BCA Laboratory on June 14, 2001. On September 11, 2001, Dolores Schoenbauer, a forensic scientist in the Biology section of the BCA Laboratory, began performing DNA analysis on the baseball cap. Schoenbauer was able to extract a mixture of human DNA from the headband portion of the baseball cap. She then created a profile of the predominant DNA within that mixture of human DNA. In order to create that DNA profile, she used AmpF/STR Profiler Plus (Profiler Plus) and AmpF/STR Cofiler (Cofiler) multiplex kits, which employ the Sort Tandem Repeat (STR) DNA profiling methodology. On September 20, 2001, Schoenbauer issued a written report regarding the profile of the predominant DNA extracted from the headband of the baseball cap. On October 11, 2001, a blood sample was taken from Gipson and transported to the BCA Laboratory for DNA testing. Again using Profiler Plus and Cofiler kits, Schoenbauer created a profile of Gipson's DNA. Based upon her findings, she concluded that, at twelve examined areas of DNA, the profile of Gipson's DNA matched the profile of the predominant DNA extracted from the headband of the baseball cap.[4]

---

[3]At trial, Nadeau positively identified Gipson in person as the man she saw in the driveway of the Firstar Bank in Hugo on June 7, 2001. She testified that her in-court identification was based upon her memory of the man's eyes, face, and build. Trial transcript at 201.

[4]At trial, Schoenbauer testified that "the probability of randomly selecting an unrelated individual from the general population that would match those 12 areas of DNA is approximately one in 523 billion." Id. at 176.

-6-

*Procedural background*

On November 20, 2001, Gipson was charged in a two-count indictment with (1) robbing the Firstar Bank in Hugo, Minnesota, on or about June 7, 2001, and (2) robbing the S&C Bank in Harris, Minnesota, on or about August 29, 2001. Gipson filed numerous pretrial motions, including (1) a motion based upon Daubert to suppress the DNA evidence linking him to the baseball cap found at the scene of Hugo bank robbery and (2) a motion to suppress Nadeau's identification of him from the photographic line-up shown to her on September 25, 2001. A magistrate judge[5] held a hearing on these and other pretrial motions and issued a report and recommendation on February 11, 2002. United States v. Gipson, No. 01-CR-342 (D. Minn. Feb. 11, 2002) (hereinafter "Magistrate Judge's Report").

Regarding Gipson's motion to suppress the DNA evidence, the magistrate judge noted that Gipson was not challenging the reliability of the STR DNA profiling methodology which was used to create the relevant DNA profiles. Rather, Gipson was challenging – as failing to meet the reliability criteria set forth in Daubert – the Profiler Plus and Cofiler multiplex kits, which employ the STR DNA methodology. Id. at 20. In response, the government argued that, because the Profiler Plus and Cofiler kits are simply tools for conducting STR DNA profiling, Daubert does not apply to them. The government argued that the reliability of Profiler Plus and Cofiler kits goes to the weight of the challenged evidence, not its admissibility. Id. In the alternative, the government argued, even if the Profiler Plus and Cofiler kits must satisfy the Daubert reliability standard, they meet all the relevant criteria. For support, the government submitted a January 2002 article published in the *Journal of Forensic Sciences*, entitled "TWGDAM Validation of AmpF/STR PCR Amplification Kits for Forensic DNA Casework," as well as an affidavit from

_____

[5]The Honorable Susan Richard Nelson, United States Magistrate Judge for the District of Minnesota.

Schoenbauer, the forensic scientist at the BCA Laboratory who performed the pertinent STR DNA profiling using the Profiler Plus and Cofiler multiplex kits.[6]

In support of his motion to suppress Nadeau's identification of him from the photographic line-up shown to her on September 25, 2001, Gipson maintained that the manner in which Nadeau was shown the two different line-ups, with his photograph appearing in both line-ups, was impermissibly suggestive. Given that Nadeau clearly did not recognize him in the first line-up, Gipson argued, she likely recognized him in the second line-up only because she had seen his picture in the first line-up just six days earlier. Moreover, Gipson argued, under the totality of the circumstances there was a very substantial likelihood of misidentification because, for example, Nadeau had not been particularly attentive at the Firstar Bank on June 7, 2001, she was not able to provide any more than a general description of the man she saw that day, and over three months had passed between her observations at the bank and her identification of Gipson from the second photographic line-up. See id. at 12-14. In response, the government argued that neither the line-ups themselves nor the manner in which they were shown to Nadeau was unnecessarily suggestive. The government further maintained that Nadeau was not likely to misidentify the man she saw at the Firstar Bank on June 7, 2001, because she had a good opportunity to observe the man at a close distance, she twice gave a detailed and accurate description of her observations, she stated to Swanson six days after the robbery that she thought she would recognize the man if she were to see him again, the photographic line-ups individually were not suggestive, and nothing was ever said or done to suggest to Nadeau that Gipson was a suspect. See id. at 14-15.

_____

[6]In support of his motion to suppress based on Daubert, Gipson did not submit an affidavit by a scientific expert, but did submit the affidavit of an attorney. According to the defense, because of Gipson's indigency, funds were not readily available to pay for the services of a scientific expert prior to the timely filing of his pretrial motions. See Magistrate Judge's Report at 21 n.5.

The magistrate judge recommended denying Gipson's motion to suppress the DNA evidence. Id. at 21-24. The magistrate judge also recommended denying Gipson's motion to suppress Nadeau's identification of him from the photographic line-up. See id. at 15-16.

Gipson filed objections to the magistrate judge's report. The district court, upon *de novo* review, adopted the magistrate judge's report and recommendation. Accordingly, the district court, among other things, denied Gipson's motion to suppress the DNA evidence and denied his motion to suppress Nadeau's identification of him from the photographic line-up. United States v. Gipson, No. 01-CR-342 (Apr. 1, 2002) (order).

Gipson's trial commenced on July 29, 2002. After the government's case-in-chief, and before the case was submitted to the jury, Gipson moved for judgment of acquittal. The district court denied his motion. On July 31, 2002, the jury returned a verdict finding Gipson guilty on both counts in the indictment. The district court sentenced Gipson to 78 months imprisonment, three years supervised release, restitution totaling $24,551, and special assessments totaling $200. This appeal followed.

**Discussion**

*Motion to suppress DNA evidence*

Gipson first argues that the district court abused its discretion in admitting into evidence Schoenbauer's expert testimony regarding DNA results produced through the use of the Profiler Plus and Cofiler multiplex kits, using the STR DNA profiling methodology. Gipson's argument focuses on the reliability prong of Daubert. See Daubert, 509 U.S. at 589 ("the trial judge must ensure that any and all scientific

testimony or evidence admitted is not only relevant, but reliable.")[7]  Gipson emphasizes that it is the Profiler Plus and Cofiler *kits*, not the STR *methodology*, that warrant exclusion of the DNA evidence under Daubert's reliability standard.

"We review a district court's admission of DNA evidence for an abuse of discretion." United States v. Johnson, 56 F.3d 947, 952 (8th Cir. 1995) (Johnson).  As a threshold matter, we must consider whether Daubert's gatekeeping function actually applies to the Profiler Plus and Cofiler kits.  The government argues that Gipson's challenge to the reliability of the Profiler Plus and Cofiler kits goes to the weight of the DNA evidence, not its admissibility.  See Brief for Appellee at 15 n.7 ("[T]he Daubert analysis does not apply to the Profiler Plus and Cofiler kits as they are not a separate methodology but are only material used to perform STR DNA analysis.") (citing United States v. Trala, 162 F. Supp. 2d 336, 346 (D. Del. 2001) ("the Cofiler and Profiler materials kits do not represent a separate part of the typing process, but rather simply contain materials for beginning the [polymerase chain reaction] process. . . . '[Q]uestions as to the reliability of the particular type of multiplex kit go to the weight of the evidence, rather than its admissibility.") (citing People v. Shreck, 22 P.3d 68, 81 (Colo. 2001))).

In applying the reliability requirement of Daubert, this court has drawn a distinction between, on the one hand, challenges to a scientific methodology, and, on

_____

[7]As this court has observed on numerous occasions, the Supreme Court in Daubert identified the following nonexclusive factors to be considered in assessing the reliability of scientific evidence: (1) whether the relevant theory or technique can be or has been tested; (2) whether the theory or technique has been subjected to peer review and publication; (3) whether the technique has a known or knowable rate of error; and (4) whether the theory or technique is generally accepted in the relevant community.  See, e.g., Jaurequi v. Carter Mfg. Co., 173 F.3d 1076, 1082 (8th Cir. 1999) (citing Daubert, 509 U.S. at 593-94);  United States v. Beasley, 102 F.3d 1440, 1446 (8th Cir. 1996) (Beasley) (same), cert. denied, 520 U.S. 1246 (1997).

-10-

the other hand, challenges to the *application* of that scientific methodology. In United States v. Beasley, 102 F.3d 1440, 1445-48 (8th Cir. 1996) (Beasley), cert. denied, 520 U.S. 1246 (1997), the district court admitted DNA evidence based upon the polymerase chain reaction (PCR) method of DNA typing, derived by using the DQ<<alpha>> Amplitype and Polymarker test kits. On appeal, the defendant in Beasley argued that the PCR method failed to meet Daubert's reliability standard and, moreover, that the laboratory which applied the PCR DNA typing method failed to observe necessary "special precautions." Id. at 1448. Upon review, this court agreed with the district court's assessment that the PCR method was sufficiently reliable under Daubert to admit the DNA results derived therefrom. See id. at 1446-47. As for the allegedly faulty application of the PCR method, the district court had opined that "these alleged deficiencies . . . go to the weight of the DNA evidence, not to its admissibility," and this court again agreed. Id. at 1448. As our court's Beasley opinion explains, the rule in this circuit is that, when the *application* of a scientific methodology is challenged as unreliable under Daubert and the methodology itself is otherwise sufficiently reliable, outright exclusion of the evidence in question is warranted only if the methodology "was so altered [by a deficient application] as to skew the methodology itself." Id. (internal quotation marks and ellipsis omitted) (quoting United States v. Martinez, 3 F.3d 1191, 1198 (8th Cir. 1993) (Martinez) (quoting In re Paoli R.R. Yard PCB Litig., 916 F.2d 829, 858 (3d Cir. 1990), cert. denied, 499 U.S. 961 (1991)), cert. denied, 510 U.S. 1062 (1994)).

In the present case, the magistrate judge recognized that Gipson's challenge under Daubert to the reliability of the Profiler Plus and Cofiler kits, as opposed to the STR method of DNA profiling, was in essence a challenge to the application of the STR methodology. See Magistrate Judge's Report at 22-23. Thus, the magistrate judge considered the reliability of the Profiler Plus and Cofiler kits for the limited purpose of determining whether the Profiler Plus and Cofiler kits were so unreliable as to materially alter the STR methodology itself. Id. at 23 ("[W]hile some circuits have determined that Daubert simply does not apply to processing kits and laboratory

protocols, the Eighth Circuit has been unwilling to go that far.  Because the <u>Martinez</u>
procedure is binding upon this Court, it has performed the initial inquiry.").  Upon
careful consideration of the evidence presented, including the pertinent January 2002
article published in the *Journal of Forensic Sciences* and Schoenbauer's affidavit, the
magistrate judge concluded that "the Profiler Plus and Cofiler kits satisfy <u>Daubert</u>."
<u>Id.</u> at 23-24.

Upon review, we agree with the magistrate judge's conclusion that the Profiler
Plus and Cofiler kits satisfy the <u>Daubert</u> reliability standard.  Thus, the evidence
before the magistrate judge certainly did not support the conclusion that the  Profiler
Plus and Cofiler kits were so unreliable that their use resulted in a material alteration
of the STR method itself.[8]  The magistrate judge's disposition of Gipson's motion to
suppress the DNA evidence under <u>Daubert</u>, which was adopted by the district court,
was not an abuse of discretion.

*Motion to suppress pretrial and in-court identifications*

Next Gipson argues that the presentation of the two photographic line-ups to
Nadeau was impermissibly suggestive, thereby tainting Nadeau's subsequent
identification of him at trial in violation of his constitutional right to due process. We
review *de novo* the issue of whether a constitutional violation has occurred. <u>Johnson</u>,
56 F.3d at 953.  The constitutional standard requires us to consider, first, whether the
pretrial identification procedures used were impermissibly suggestive and, second,
if they were impermissibly suggestive, whether they created a very substantial
likelihood of irreparable misidentification under the totality of the circumstances. <u>Id.</u>

---

[8]However, we reiterate that: "[I]n every case, of course, the reliability of the
proffered test results may be challenged by showing that a scientifically sound
methodology has been undercut by sloppy handling of the samples, failure to properly
train those performing the testing, failure to follow the appropriate protocols, and the
like." <u>Beasley</u>, 102 F.3d at 1448.

-12-

While there is, of course, a greater risk of improper suggestion when a witness is shown a suspect in two separate line-ups as opposed to one, that is not to say that such pretrial identification procedures will always be impermissibly suggestive. See, e.g., Johnson, 56 F.3d at 953-54 (use of two photographic line-ups was not impermissibly suggestive where, among other things, the photographs in the two line-ups were all of men of the same race and similar features, and there was no evidence of any prompting or suggestion from the officer on any occasion). In the present case, the two photographic line-ups at issue contained two different photographs of Gipson, taken approximately eight months apart and showing him with different hair lengths and amounts of facial hair. In each of the two photographic line-ups, Gipson's photograph was displayed with five others, and all six photographs were of Caucasian men having similar general appearance, build, hair length, and facial hair. Upon looking at the first photographic line-up, Nadeau quickly concluded that all six men were too old and their hair was too long for any of them to be the man she saw at the Firstar Bank. She immediately returned the photographic line-up to Sergeant Swanson. Under these circumstances, it is highly unlikely that she could have formed a lasting memory of any particular individual based solely upon the photographs. She was not told that she would be shown another photographic line-up, and nothing was said or done to suggest that any one of the six men in the first photographic line-up was a suspect. The second photographic line-up was not shown to her until almost a week later. Six days after seeing the first photographic line-up, Nadeau was shown the second line-up containing the photograph of Gipson at a slightly younger age and with shorter hair and less facial hair than in the first. This photograph drew Nadeau's attention, and shortly thereafter she identified Gipson as the man she saw at the Firstar Bank. It is true that Investigator Johnson was helpful and responsive to Nadeau as she was trying to focus on Gipson's basic features; however, he did not say or do anything to indicate to Nadeau that Gipson was in fact a suspect. Upon *de novo* review, we hold that the pretrial identification procedures used in the present case were not impermissibly suggestive.

Even if we were to hold that the pretrial identification procedures used were impermissibly suggestive, there was not a substantial likelihood of irreparable misidentification under the totality of the circumstances. Regarding this second part of the analysis, we consider the following factors: (1) Nadeau's opportunity to observe the man she saw leaving the Firstar Bank; (2) her degree of attention at that time; (3) the accuracy of her description of what she observed; (4) her degree of certainty at the time she identified Gipson's photograph; and (5) the length of time between her observations at the Firstar Bank and her identification of Gipson from the second photographic line-up. See Johnson, 56 F.3d at 954.

Nadeau had a good opportunity to observe the man standing in the driveway of the Firstar Bank because he was blocking her car, was only about ten feet away, and looked directly at her. Moreover, even though she did not know that a robbery had just occurred, her attention was drawn to him because he had dropped his hat and was apparently unsure as to whether or not he should retrieve it. Her description of the man was generally consistent with Gipson's appearance. Moreover, Johnson testified that Nadeau appeared "very sure" of her identification of Gipson from the second photographic line-up. Motions Hearing transcript at 50 (Jan. 14, 2002). Finally, the lapse of approximately three months between Nadeau's observation of the man at the Firstar Bank and her identification of Gipson from the photographic line-up was not an unusually long time to remember a person's face. In sum, we hold upon *de novo* review that Gipson's due process rights were not violated as a result of the pretrial and in-court identification procedures used in the present case.

*Sufficiency of the evidence*

Finally, Gipson argues that the evidence was insufficient as a matter of law to support the jury's conclusion that the bank robberies were accomplished through the use of intimidation. Gipson argues that the robber's actions at both the Firstar Bank

-14-

and the S&C Bank were significantly less threatening than conduct that this court has previously found to be sufficient to establish intimidation under 18 U.S.C. § 2113(a).

Upon review, "we examine the evidence in the light most favorable to the government, giving it the benefit of all reasonable inferences." United States v. Caldwell, 292 F.3d 595, 596 (8th Cir. 2002) (Caldwell). "We reverse only if we conclude that a reasonable fact-finder must have entertained reasonable doubt about the government's proof of one of the offense's essential elements." Id.

Bank robbery is defined to include the taking "by force and violence, or by intimidation . . . from the person or presence of another . . . any property or money or any other thing of value belonging to, or in the care, custody, control, management, or possession of, any bank, credit union, or any savings and loan association." 18 U.S.C. § 2113(a). The intimidation element is satisfied if an ordinary person in the position of a victim teller or bank employee reasonably could have inferred a threat of bodily harm from the robber's actions. United States v. Yockel, 320 F.3d 818, 824 (8th Cir.) (Yockel) ("[T]he intimidation element of section 2113(a) is satisfied if an ordinary person in [the teller's] position reasonably could infer a threat of bodily harm from the [defendant's] acts.") (internal quotation marks omitted), cert. denied, 124 S. Ct. 98 (2003). Moreover, it is not necessary that the teller or bank employee was actually intimidated or that the robber specifically intended to intimidate him or her. See Caldwell, 292 F.3d at 596 ("'Intimidation is conduct reasonably calculated to put another in fear . . . [T]he acts of the defendant must constitute an intimidation to an ordinary, reasonable person.' . . . Whether the defendant's actions did induce fear in an individual victim is not conclusive, but is probative of whether his actions were objectively intimidating.") (quoting United States v. Smith, 973 F.2d 603, 604 (8th Cir. 1992)); Yockel, 320 F.3d at 824 ("As intimidation is measured, in this circuit, under an objective standard, whether or not [the defendant] intended to intimidate the teller is irrelevant in determining guilt.").

-15-

In the present case, in each of the two charged bank robberies, the perpetrator was wearing a black mask, ordered the bank employees to the ground, and came over the counter towards them before grabbing money. At the Firstar Bank, one of the victim tellers began to cry, and another feared that she would be kicked in the head when the robber saw her looking up and ordered her to put her head down. Viewed in the light most favorable to the government, the evidence reasonably supported the jury's finding of intimidation. See, e.g., Caldwell, 292 F.3d at 595 (finding of intimidation upheld where the defendant slammed his hands down on the bank teller's desk and leaped over the counter toward her, approaching within one or two feet). Although there is no indication that a weapon was present, or that the use of a weapon was threatened, this court has previously held that "'the display of a weapon, a threat to use a weapon, or even a verbal or nonverbal hint of a weapon, is not a necessary ingredient of intimidation under § 2113(a).'" Yockel, 320 F.3d at 825 (quoting United States v. Gilmore, 282 F.3d 398, 402 (6th Cir. 2002)); see also Caldwell, 292 F.3d at 597 ("While [the defendant] did not speak or give any indication that he had a weapon, his aggressive actions would be intimidating to a reasonable person."). The evidence in the present case was sufficient as a matter of law to support the jury's conclusion that the bank robberies were accomplished through the use of intimidation.

## Conclusion

The judgment of the district court is affirmed.

_____

-16-