FRANCIS M. STEWARD

*v.*

THE PEOPLE OF THE STATE OF ILLINOIS.

*Opinion filed December 22, 1906.*

ROBBERY—*what does not sustain conviction for robbery.* Proof that the defendant, a physician, induced a person who had been brought to his office by a confederate, to undergo an examination and pay him an exorbitant amount for treatment does not justify a conviction for robbery, where methods used to obtain the money, though disreputable, do not amount to violence or intimidation, even though the victim testifies that he paid the money because the defendant's manner frightened him.

WRIT OF ERROR to the Criminal Court of Cook county; the Hon. GEORGE KERSTEN, Judge, presiding.

D. G. RAMSAY, and CHARLES G. NEELY, for plaintiff in error:

Robbery is the violent taking of property from the person of another by force or intimidation or after a "putting in fear" of the person. Hurd's Stat. chap. 38, sec. 246; *Hall* v. *People,* 171 Ill. 540; *Burke* v. *People,* 148 id. 74.

The fraudulent or felonious taking of property by means of a trick or artifice, but without violence, does not constitute robbery. *Shinn* v. *State,* 64 Ind. 13; *Simmons* v. *State,* 41 Fla. 316; *Williams* v. *State,* 12 Tex. App. 240.

The "putting in fear," where violence is not used, must be fear of personal harm. Threats, etc., are not sufficient. 1 McClain on Crim. Law, sec. 470; *State* v. *Brennon,* 25 Ind. 403; *Long* v. *State,* 12 Ga. 293.

The menace must be of a sort to excite reasonable apprehension of danger. Nothing short will do. 2 Bishop on New Crim. Law, sec. 1170; *Commonwealth* v. *Snelling,* 4 Binn. 379; *Mahoney* v. *People,* 5 Thomp. & C. 329.

The parting with the thing must occur while the seeming danger continues, and not after time has elapsed for the danger to be removed. 2 Bishop on New Crim. Law, sec. 1170; *Rex* v. *Jackson,* 1 East's P. C. 21; 1 Hawkins' P. C. 213.

If there is no actual fear and no violence the offense is not robbery, even though there is reasonable ground for fear. 1 McClain on Crim. Law, sec. 470; *Rex* v. *Reane,* 2 East's P. C. 734.

Force, in a legal sense, implies actual personal violence, a struggle and a personal outrage. Intimidation is the putting in fear. *Collins* v. *People,* 39 Ill. 233; *Long* v. *State,* 12 Ga. 293; *Routt* v. *State,* 61 Ark. 594.

To constitute robbery by violence, the violence must be used to force the prosecutor to part with his property, not

only against his will, but in spite of resistance. *McCloskey* v. *People,* 5 Park. Crim. 299; *Stevens* v. *State,* 19 Neb. 647; *Rex* v. *Gnosil,* 1 C. & P. 400; *State* v. *John,* 50 N. C. 163; *State* v. *Miller,* 83 Iowa, 291; *People* v. *McGinty,* 24 Hun, 62; *Davis* v. *Commonwealth,* 21 Ky. L. 1295.

W. H. STEAD, Attorney General, JOHN J. HEALY, State's Attorney, and HARRY OLSON, for the People:

Robbery is the felonious and violent taking of money, goods ·or other valuable things from the person of another by force or intimidation. Hurd's Stat. chap. 38, sec. 246.

The force, which is an essential of the offense, may be actual personal violence or putting in fear of life or of bodily injury, or by violence or putting in fear. There must be force preceding or accompanying the taking, though it may consist of acts alone; and the degree of force used is entirely immaterial, if it be sufficient to constitute violence and to overcome the power of the possessor to retain his goods and induce him unwillingly to part with them. An exciting fear is constructive violence. Cameron on Crim. Law, 287.

Where the consent of the owner to the taking is procured only by force or duress it does not prevent the act being a crime. 1 McClain on Crim. Law, sec. 559; *Regina* v. *Mc-Grath,* L. R. 1 C. C. 205; *Regina* v. *Lovell,* 8 Q. B. Div. 185; *Regina* v. *Hazel,* 11 Cox, 597.

If the property is obtained by duress then no title passes. *Perkins* v. *State,* 65 Ind. 317; *Regina* v. *Morgan,* 6 Cox's C. C. 408.

It is sufficient if the property be taken in the presence of the owner. It need not be taken from his person. 2 East's P. C. 707; 4 Blackstone's Com. 242.

Where property is taken openly it may be considered as tending to show want of criminal intent. But such action is not conclusive, and the question of intent is for the decision of the jury. *People* v. *Hanson,* 84 Cal. 291; *State* v. *Powell,*

103 N. C. 424; *State* v. *Hill,* 114 id. 780; *Barnes* v. *State,* 103 Ala. 44.

The means need not be such as would put in fear one used to the ways of the world. *State* v. *Carr,* 43 Iowa, 418.

When the offense is committed by putting in fear it is robbery. If the property is taken against the will of the owner it is sufficient that the property be delivered during the continuance of the fear or apprehension. Rapalje on Larceny, sec. 447.

There may be constructive fear. A menace of any kind which operates on a man so as to put him, in his own apprehension, under the necessity of delivering his money to another who meant to steal it, is a constructive force. 2 East's P. C. 719.

Mr. JUSTICE FARMER delivered the opinion of the court:

Plaintiff in error was convicted at the January term, 1906, of the criminal court of Cook county of the crime of robbery and sentenced to the penitentiary. To reverse the judgment of the criminal court he brings the case here by writ of error. Charles Armstrong was jointly indicted with the plaintiff in error, but on the trial he was acquitted.

Plaintiff in error is a physician, and at the time of the alleged robbery had an office at 269 Dearborn street, Chicago. Felix Berard, the prosecuting witness, arrived at the depot of the Chicago and Northwestern railway, in the city of Chicago, on the morning of October 13, 1905. He came from Boise City, Idaho, and was on his way to Montreal, Canada. From the Northwestern depot he went by bus to the Wabash depot. Berard was of French descent and spoke the French language. The substance of his story from that point is, that when he alighted from the bus a "runner" for a restaurant in that vicinity took his satchel and carried it to a restaurant. He started to follow him, when Charles Armstrong, also a restaurant "runner," asked him where he

was going. Berard said he was going to Montreal, and Armstrong then said he was a Frenchman and began talking to Berard in the French language. Armstrong asked him if he had any money, which caused Berard to inquire of Armstrong if he was connected with the station. Armstrong replied that he was not. Berard then said he was going after his satchel, and Armstrong told him the restaurant to which it had been taken was his and assured him the satchel would be perfectly safe. He told Berard he knew some people in Upper Canada, and asked him why he left Boise City. Berard told Armstrong he was not feeling well; that he had a little touch of catarrh, and would go to the station and smoke. As a matter of fact he says he was feeling all right but told Armstrong this to get rid of him. Armstrong asked why he did not go see a doctor, and said he knew the best doctor in the city; that he was his family physician and would not charge Berard anything for an examination. After some further urging he went with Armstrong to the office of plaintiff in error. The doctor (plaintiff in error) was not in the office when they arrived and they sat down and waited till he came, which was in a short time. When the doctor came in he spoke to Armstrong, but Berard did not understand what was said. Dr. Steward then asked Berard if he was sick, and Berard told him he had catarrh. The doctor said he would give him a free examination but he would have to pay for medicine, and took him into another room where there was an operating chair, told him to take off his coat and vest, pull down his trousers, raise his shirt and undershirt and lie down on the operating chair. All of Berard's money, except some change, was in his vest pocket, and when he was lying on the operating chair he could not see his coat and vest where they were lying on another chair. The doctor took something and pounded over his chest, felt his private parts, and told him to look in a long, black stick and asked him if he could see, to which Berard replied he could see a light. The doctor then took a

brush and put something in his nose, which made him spit.
Berard then attempted to get up, but the doctor commanded
him to sit down and told him of many cures of people all
over the world he had effected, and said he had cured heart
disease and all other diseases he mentioned. He told Berard
he had heart disease and kidney trouble; that his private
parts were very weak, and asked him if had ever had any
disease from women, to which Berard replied he had not.
He also told him his head was rotten with catarrh and that
he stunk. He then inquired of Berard how much money he
had, to which Berard made no reply. The doctor then said:
"Come! come! How much money have you got? Have you
got one, two or three hundred dollars, or more? How much
have you got?" Berard says this frightened and excited him,
and he said $150; that the doctor touched him a little when
he asked how much money he had, and when he attempted
to pull up his trousers the doctor pulled them down. Berard
says he had $540 besides some change, and that $500 of it
was in his inside vest pocket, which was lying on a chair
where he could not see it while on the operating chair. The
doctor said, "You pay me $110." Berard got off the chair
and said he would do so, and the doctor said, "Your money
is in your vest pocket," and handed Berard the vest, who
paid him. Berard says he did it because he was afraid, and
that it was the doctor's manner that frightened him. The
doctor then gave a prescription for medicine and told him
to go out to the White City with Armstrong. Armstrong
also asked him to go to the White City. This he declined
to do, but went to a drug store. Armstrong accompanied
him and got his prescription filled. After leaving the drug
store he told Armstrong he was going to a restaurant to get
his breakfast, and Armstrong went with him and waited for
him outside. When Berard came out from breakfast Arm-
strong asked him to go with him and get a room and take
a sleep. This he declined to do, and said he would go to the
station and sit down and smoke. Armstrong told him he

would not be allowed to smoke in the station and asked him to go across the street to a hotel or saloon. Berard went with him to the place suggested and Armstrong asked him to have a drink. This he declined and went to the station and told a policeman of what had happened.

The substance of the most material parts of Armstrong's testimony is, that when he first spoke to Berard at the station Berard said he was very sick; that he had a very bad night and thought he was going home not to come back. Armstrong encouraged him and told him not to give up, and said to him, as he could not leave till three o'clock, he knew a good doctor who was his family physician and in whose abilities he had great confidence. Berard asked him to accompany him to the doctor's office, which he did. When they arived at the doctor's office it was open but the doctor was not in. He came in a short time afterwards, and Armstrong told the doctor Berard was a countryman of his and wanted to talk to him. The doctor took Berard in another room. Another Dr. Steward, a brother of plaintiff in error, was in one of the rooms of plaintiff in error's suite and a lady also was in his private room. After awhile Berard and the doctor came out into the room where Armstrong was. Berard had a druggist's card in his hand. He and the doctor shook hands and Berard asked Armstrong if he would show him the drug store. He consented, and together they went to the Palmer House drug store. When they left the drug store Berard asked Armstrong to show him the restaurant where his satchel was, which he did, and left him there to eat his breakfast. Afterwards he met Berard, had some little talk with him, asked him to take a drink, which was declined, and they separated.

The substance of the testimony of plaintiff in error was, that when he first saw Armstrong and Berard on the morning in question they were in his office. Armstrong told him Berard was not well and the doctor invited him to go into his private office. Armstrong remained in the reception

room.  Berard told him he was not well, and asked the doctor if he would charge him anything for an examination. The doctor told him he would not if he took no treatment from him; if he took treatment he would tell him what he would charge him.  At the doctor's request Berard took his coat off, pulled his shirt up to his neck, and the doctor examined his chest and heart.  After that he put his coat and vest on and sat·down in a chair while his nose and throat were examined.  The doctor told him his heart and lungs were all right but he had a bad case of catarrh.  He inquired of the doctor about treating him for it, and the doctor told him he would require treatment ten or twelve months, for which he would charge him $120, to be paid in cash or in installments as the treatment was given, as best suited Berard. He announced he would take the treatment and the first one was then given him.  The doctor then stepped into the next room, where his brother was, who was also.a doctor, and dictated some prescriptions to him to be given Berard.  Berard inquired how much the medicine would cost, and proposed if the doctor would make the whole treatment $110 he would pay it in cash then.  This the doctor agreed to, and Berard took out of his pocket and handed the doctor six twenty-dollar gold pieces.  The doctor asked his brother to change one of the gold pieces so he could give back to Berard ten dollars, which the brother did.  The doctor's brother, at his request, made out a receipt to Berard in full, the doctor signed and gave it to him, and they bade each other goodby.  Berard asked Armstrong to go with him to the drug store, and they went away together.

Ellen G. Roberts, who testified she was plaintiff in error's regularly retained lawyer but who took no part in the trial of this case, testified she was in his office at the time Berard and Armstrong were there.  She was in the private room next to the one the doctor had Berard in.  The doctor's brother was in the same room, sitting at the desk.  She heard conversation between the doctor and his patient.  The

door was open between the room she was in and the one they were in. The partition also between them was glass and she could see into the room where they were. The doctor came into the room where his brother was and asked him to write the prescriptions, which the brother did, and the doctor took them back into the other room. He came back again where his brother was and asked him to change a twenty-dollar gold piece. The brother gave him two ten-dollar bills and the witness saw the doctor give one of them to Berard, and heard him tell him to go to the Palmer House drug store to get his prescriptions filled and give directions to Berard about writing to him to the address on an envelope he gave him, and then they said good-by. Berard asked Armstrong to go with him to the drug store, and they left together.

It was testified to by the druggist who filled the prescriptions given to Berard, and by another druggist familiar with the handwriting of Dr. O. S. Steward, the brother of plaintiff in error, that the prescriptions were in the handwriting of Dr. O. S. Steward.

The foregoing is the substance of the most material testimony heard at the trial, and while there is much in it well calculated to excite doubts as to the good faith and honesty of purpose of plaintiff in error and Armstrong, we cannot sustain a conviction for robbery upon the evidence in this record. The methods employed by Francis M. Steward, the plaintiff in error, to secure the money from Berard are strikingly similar to those employed by the plaintiff in error in the case of *Steward* v. *People,* 173 Ill. 464. In that case the indictment was for larceny. The evidence shows the party from whom the money was obtained came to Chicago from South Dakota and was steered into the office of the plaintiff in error, a doctor, by another person, and $50 obtained from him by means very much like those described by Berard. The judgment of conviction was reversed by this court because the evidence showed the victim was induced to part with his money without any show of physical force. The

court said (p. 470): "The methods employed were disreputable, and Klepstein was over-persuaded and induced to do what he would not have otherwise done, but it was not from any restraint or apprehension of violence." Our statute defines robbery to be "the felonious and violent taking of money, goods, or other valuable thing, from the person of another by force or intimidation." At common law, robbery was defined to be the "taking of a thing of value from the person or presence of another against his will, by force or by putting him in fear." (24 Am. & Eng. Ency. of Law,—2d ed.—991.) This court said in *Burke* v. *People,* 148 Ill. 70: "On a charge of robbery, if it appears that one makes an assault on another, and against the will of the one assaulted takes from his person his money, goods or other valuable thing by force or intimidation, the offense is shown. The gist of the offense is the force or intimidation, and the taking from the person, against his will, a thing of value belonging to the person assaulted." In *Hall* v. *People,* 171 Ill. 540, it was said: "On a charge of robbery, if it appears that one makes an assault on another and against the will of the one assaulted takes from his person his money, goods or other valuable thing by force or intimidation, the offense is shown." Substantially the same language was used in *Schroeder* v. *People,* 196 Ill. 211. All the authorities agree that to constitute the crime of robbery there must be violence, or intimidation of such a character as that the injured party is "put in fear." The fear "must be of such a nature as in reason and common experience is likely to induce a person to part with his property against his will, and to put him, as it were, under the temporary suspension of the power of exercising his will through the influence of the terror impressed." (24 Am. & Eng. Ency. of Law,— 2d ed.—999.)

The word "disreputable," applied to the methods of plaintiff in error in *Steward* v. *People, supra,* is equally applicable to the methods adopted in this case, but we are of opinion

the evidence in this record is insufficient to establish, beyond
a reasonable doubt, the guilt of plaintiff in error of the crime
of robbery charged in the indictment, and the judgment of
the criminal court will be reversed and the cause remanded.

*Reversed and remanded.*