2004 SD 132

**STATE of South Dakota, Plaintiff and Appellee,**

v.

**James PASEK, Defendant and Appellant.**

No. 23096.

Supreme Court of South Dakota.

Considered on Briefs Oct. 4, 2004.

Decided Dec. 22, 2004.

Lawrence E. Long, Attorney General, Jeffery J. Tronvold, Assistant Attorney General, Pierre, South Dakota, Attorneys for plaintiff and appellee.

Joseph M. Kosel, Lawrence County Public Defender's Office, Deadwood, South Dakota, Attorney for defendant and appellant.

ZINTER, Justice:

[¶ 1.] James Pasek escaped from jail in Bozeman, Montana, stole a vehicle, and drove to Gillette, Wyoming where he met his friend, Christina Starr. While with Starr, he told her that he was going to rob another bank. Despite being counseled against the idea, Pasek robbed the First Western Bank in Spearfish, South Dakota. Pasek then stole another vehicle in Spearfish, and was ultimately arrested in Bloomington, Indiana. Pasek was convicted of robbery in the first degree, grand theft (cash from the bank), grand theft (the second vehicle), and grand theft by possession of stolen property (the first vehicle). Pasek appeals contesting (1) the sufficiency of the evidence, (2) the denial of his motion for mistrial, (3) the finding that he had committed three prior felonies, and (4) his sentence of life imprisonment without parole.

**Facts and Procedural History**

[¶ 2.] On June 29, 2003, Pasek escaped from jail in Bozeman, Montana, where he was being held on charges relating to a prior bank robbery. After escaping, he stole a Lincoln Mark VIII in Bozeman and drove to South Dakota. On June 30, 2003, Pasek walked into the First Western Bank in Spearfish and handed the teller, Tara Hicks, a note. The note stated: "This is a robbery, hand over all the hundreds, fifties, twenties, and tens, and do it quietly." The bottom of the note said "no funny s—t."

[¶ 3.] Being "in fear of [her] life," Hicks gave Pasek the money. She put the money in a silver cosmetic bag that Pasek had placed on her teller station. Hicks did not notice a weapon on Pasek. However, she was not sure if he had a weapon. Hicks stated that she responded calmly because she had been trained to react in that manner, regardless of the circumstances of the robbery. The money given Pasek included "bait money"; i.e., marked money that activated an alarm at the police station. Pasek left the bank in a stolen GMC Envoy, and Hicks dialed 911.

[¶ 4.] After the robbery, Pasek drove to Gillette and picked up his friend, Christina Starr, whose stepmother lived in Bloomington, Indiana. Pasek was later taken into custody in Bloomington in possession of the GMC Envoy and a "wad of money," including one bill that matched the serial number of the bait money taken in the Spearfish robbery.

[¶ 5.] A jury found Pasek guilty of the offenses, and his motions for judgment of acquittal and judgment notwithstanding the verdict were denied. A Part II information alleged that Pasek was a habitual criminal. A court trial was held on that information, and the court found that Pasek had three prior felonies, including one crime of violence. Consequently, Pasek was sentenced as an habitual offender to life in prison without parole on the first degree robbery conviction. He was sentenced to fifteen years on each of the other three counts. All four sentences were to run concurrently. Pasek now appeals.

## Analysis and Decision

### *Sufficiency of the Evidence*

[¶ 6.] Pasek asserts that there was insufficient evidence, as a matter of law, to find that he committed first degree robbery. He contends that the evidence was insufficient because he did not use any force or brandish a weapon. Therefore, Pasek argues that the requisite element of force or fear was absent.

[¶ 7.] "The standard of review for denial of a motion for judgment of acquittal is whether the 'evidence was sufficient to sustain the convictions.'" *State v. Verhoef,* 2001 SD 58, ¶ 22, 627 N.W.2d 437, 442 (citing *State v. Larson,* 1998 SD 80, ¶ 9, 582 N.W.2d 15, 17). The standard of review for determining the sufficiency of the evidence is well settled.

"In determining the sufficiency of the evidence on appeal in a criminal case, the issue before this Court is whether there is evidence in the record which, if believed by the jury, is sufficient to sustain a finding of guilt beyond a reasonable doubt." In making that determination, "we accept the evidence and the most favorable inferences fairly drawn therefrom, which will support the verdict." Moreover, "the jury is ... the exclusive judge of the credibility of the witnesses and the weight of the evidence." Therefore, this Court does not resolve conflicts in the evidence, or pass on the credibility of witnesses, or weigh the evidence.

*State v. Laplante,* 2002 SD 95, ¶ 19, 650 N.W.2d 305, 310 (internal citations omitted). Thus, "[a] guilty verdict will not be set aside if the state's evidence and all favorable inferences that can be drawn therefrom support a rational theory of guilt." *State v. Jones,* 521 N.W.2d 662, 673 (S.D.1994) (citation omitted).

[¶ 8.] "Robbery is the intentional taking of personal property ... in the possession of another from his person or immediate presence, and against his will, accomplished by means of force or fear...." SDCL 22–30–1.[1] Robbery in the first degree must be "accomplished by the use of force or by putting the person robbed in fear of some immediate injury to his person...." SDCL 22–30–6.[2] That fear, necessary for robbery in the first degree, may be either:

(1) The fear of an injury, immediate or future, to the person or property of the person robbed, or of any relative of his or member of his family; or

(2) The fear of an immediate injury to the person or property of anyone in the company of the person robbed at the time of the robbery.

SDCL 22–30–3.

[¶ 9.] Pasek argues that because Hicks had been trained to react calmly during a robbery, she was not sufficiently fearful to satisfy the "fear" requirement of these statutes. Pasek emphasizes that he had no weapon during the robbery and he made no overt threat of a present or future injury. He finally asserts that "the note given to the teller was as benign as

---

1. SDCL 22–30–1 provides:
   Robbery is the intentional taking of personal property, regardless of value, in the possession of another from his person or immediate presence, and against his will, accomplished by means of force or fear, unless the property is taken pursuant to process or otherwise pursuant to law.

2. SDCL 22–30–6 provides:
   Robbery when accomplished by the use of force or by putting the person robbed in fear of some immediate injury to his person is robbery in the first degree. When accomplished in any other manner, it is robbery in the second degree.

any unauthorized request for money could be composed." These arguments fail on both the facts and the law applicable to this case.

[¶ 10.] Factually, there was sufficient evidence from which the jury could have reasonably inferred that Hicks was in fear during this robbery. Hicks testified that because of the "language of the note," she took it very seriously, she was emotionally upset, and she was "very fearful. [She] was in fear of [her] life as well as [her] other co-workers and any customers that were in the bank." Hicks also testified that just because Pasek did not show her a weapon that did not mean he did not have a weapon. She stated "maybe if I didn't cooperate, maybe he did have [a weapon]. I didn't know." She explained, "I was trained to give him the money because you never know if they have a weapon, just because they didn't show you. I didn't want to take the chance." Finally, Hicks' supervisor testified that she was visibly shaken immediately after the robbery, and a detective with the Spearfish Police Department confirmed that Hicks was shaking and very upset approximately ten minutes after the robbery. Clearly, this evidence was sufficient to establish the requisite element of fear in this robbery.

[¶ 11.] We also note that legally, the fear necessary for robbery is not measured by the subjective feelings of the victim. "As in the analogous crime of assault, the word 'fear' in connection with robbery does not so much mean 'fright' as it means 'apprehension'; one too brave to be frightened may yet be apprehensive of bodily harm." LaFave, Wayne R., Substantive Criminal Law § 20.3(d) (2d ed.2003). Thus, as the Eighth Circuit Court of Appeals has explained, an objective standard is used for the analogous "intimidation" element in the federal law[3] on robbery. *United States v. Yockel*, 320 F.3d 818, 824 (8thCir.2003). The Eighth Circuit noted: "[t]he intimidation element is satisfied if an ordinary person in the position of a victim teller or bank employee reasonably could have inferred a threat of bodily harm from the robber's actions." *United States v. Gipson*, 383 F.3d 689, 699 (8thCir.2004) (citing *Yockel*, 320 F.3d at 824). *See also, United States v. Brown*, 412 F.2d 381 (8thCir.1969) (jury could justifiably find that the teller was intimidated when the defendant passed teller a note saying it was a hold up and he would kill her if she said a word, even though the teller dropped the note to attract attention, pulled out marked money from her cash drawer, told defendant "to show me your gun, you little snot, or get out of here," and defendant then left empty handed); *United States v. Bingham*, 628 F.2d 548, 548 (9thCir.1980) ("Taking by intimidation is the willful taking in such a way as would place an ordinary person in fear of bodily harm").

[¶ 12.] State courts also agree that if the circumstances of a robbery would "ordinarily induce fear in the mind of a reasonable person, then the victim may be found to be in fear ...." *Magnotti v. State*, 842 So.2d 963, 965 (Fla.Dist.Ct. App.2003). "[T]he controlling factor is not necessarily the victim's subjective state of

---

**3.** 18 U.S.C.A. § 2113(a) (2002) on bank robbery and incidental crimes provides in relevant part:

Whoever, by force and violence, or by intimidation, takes, or attempts to take, from the person or presence of another, or obtains or attempts to obtain by extortion any property or money or any other thing of value belonging to, or in the care, custody, control, management, or possession of, any bank, credit union, or any savings and loan association ... shall be fined under this title....

mind, but whether a jury could conclude that a reasonable person,[4] under like circumstances, would have felt sufficiently threatened to accede to the robber's demands." *Id.* Or, as stated in *Hawthorne v. State*:

> 'The fear must be of such a nature as in reason and common experience is likely to induce a person to part with his property against his will, and to put him, as it were, under the temporary suspension of the power of exercising his will through the influence of the terror impressed.'

501 P.2d 155, 157 n. 5 (Alaska 1972) (quoting *Steward v. People*, 224 Ill. 434, 79 N.E. 636, 639 (1906)). We agree with these authorities and further note that if this reasonable person standard is met, it does not matter whether the defendant actually intended the intimidation. *Yockel*, 320 F.3d at 824.

[¶ 13.]Considering the law and facts of this case, we conclude that a jury could have reasonably found that Hicks was placed in fear of immediate injury within the meaning of SDCL 22–30–3 and 22–30–6.[5]

### *Motion for Mistrial*

[¶ 14.]Prior to the robbery and while in the first stolen vehicle, Pasek told Starr that he had escaped from jail after a different bank robbery in Montana, that he had stolen the car, and that he planned to rob another bank. Parts of this admission were disclosed to the jury as *res gestae* evidence. Pasek contends that a mistrial should have been granted because it was "impermissible [other acts] evidence."

[¶ 15.] The standard of review for a denial of a mistrial is well-settled.

> Trial courts have considerable discretion not only in granting or denying a mistrial[,] but also in determining the prejudicial effect of a witness' statements. Only when this discretion is clearly abused will this court overturn the trial court's decision. To justify the granting of a mistrial, an actual showing of prejudice must exist. Prejudicial error for purposes of determining whether error constitutes grounds for mistrial is error 'which in all probability must have produced some effect upon the jury's verdict and is harmful to the substantial rights of the party assigning it.'

*State v. Phair*, 2004 SD 88, ¶ 13, 684 N.W.2d 660, 665 (quoting *State v. Anderson*, 1996 SD 46, ¶ 21, 546 N.W.2d 395, 401; quoting *State v. Myers*, 464 N.W.2d 608, 609–610 (S.D.1990)).

[¶ 16.] The testimony at issue was elicited in Starr's direct examination. The following exchange occurred between the prosecutor and Starr:

> **Prosecutor:** Did you say anything to him about his plan to rob a bank?

---

4. Pasek also argues that Hicks' alleged fear was due to "mere temperamental timidity." However, this argument ignores the objective standard. Having the forethought and training to calmly give Pasek the bait money and call 911 does not negate an objective finding of fear. Furthermore, there is no evidence that Hicks was a timid person or that she was "easily" placed in fear.

5. Pasek also contends that there "was confusion" regarding the proper instruction to be given to the jury on "fear," and he requests "clarification" from this Court on the specific fear necessary to satisfy both degrees of robbery under SDCL 22–30–3 and 22–30–6. However, Pasek has failed to provide argument, failed to identify any alleged error, and failed to cite authority for his request. "The failure to cite supporting authority is a violation of SDCL 15–26A–60(6) and the issue is thereby deemed waived." *State v. Pellegrino*, 1998 SD 39, ¶ 22, 577 N.W.2d 590, 599 (citing *State v. Knoche*, 515 N.W.2d 834, 840 (S.D.1994); *State v. Dixon*, 419 N.W.2d 699, 701 (S.D.1988)).

**Starr:** Um, I didn't want him to, because that's how he got busted before, but . . .

**Prosecutor:** What did you say to him about his plan to rob a bank, if anything?

**Starr:** I told him he shouldn't rob a bank because you're going to get locked up again.

**Prosecutor:** What did he say when you told him not to rob a bank?

**Starr:** He said that that was his only way to get money and he had to.

[¶ 17.] Pasek contends that the State elicited this evidence, which disclosed a prior robbery, in violation of a trial court ruling. Pasek specifically asserts that the trial court, in a prior hearing, had ruled that it would allow Starr's testimony "as to the theft of the vehicle and possible escape from Montana, but no mention of a prior bank robbery was ever allowed." However, this alleged ruling of the trial judge is not found in the record. *See infra,* ¶ 19.

[¶ 18.] Furthermore, the trial court's reasoning for denying a mistrial was that the court "could not tell from the questions themselves that they were designed to elicit . . . responses regarding any prior criminal activity [the prior robbery]." We agree. We also note that Starr was immediately admonished from making "any references to any other prior offenses . . . whether that be references to escape attempts or robberies," with the exception of the stolen Lincoln Mark VIII. Considering the nonresponsive nature of Starr's answers and the court's curative admonishment, we see no abuse of discretion in denying the motion for mistrial.

[¶ 19.] Although Pasek also insists that the prosecutor intentionally vio-

lated a pretrial order in asking these questions, we note that these questions were permitted by the court's pretrial ruling. At the pretrial motion hearing regarding other acts evidence, Judge Johnson stated that he had read the transcript of Starr's grand jury testimony, and he allowed its admission stating "in my opinion, [Starr's grand jury testimony is] clearly *res gestae* evidence and not other acts evidence, so I would expect to allow the testimony by the witness consistent with her grand jury testimony. . . . I would not consider her testimony to be other acts evidence." The grand jury testimony was essentially identical to the disputed evidence restated above. Starr stated to the grand jury:

> [Pasek] told us that he planned on robbing another bank. . . . We [friend Tara and Starr] both told him that that was stupid, and that was what always got him thrown in jail, and that it was stupid, but he didn't listen. . . .

Because the trial court had previously ruled that it would allow Starr to testify consistent with her grand jury testimony, we reject Pasek's suggestion that the State's questions reflected a "pervasive disrespect . . . for the rules of evidence" and the trial court's prior rulings on other acts evidence.[6]

[¶ 20.] With respect to the merits of the trial court's *res gestae* ruling, we have previously permitted "admission of other crimes where such evidence is 'so blended or connected' with the one[s] on trial . . . that proof of one incident involves the other[s]; or explains the circumstances; or tends logically to prove any element of the crime charged." *State v. Hoadley,* 2002 SD 109, ¶ 37, 651 N.W.2d

6. Pasek also asserts that, during trial, the State elicited testimony that Pasek had previously escaped from custody. However, our review of the cited portion of the transcript reflects no other testimony disclosing Pasek's escape from jail.

249, 258 [7] (quoting *State v. Andrews*, 2001 SD 31, ¶ 9, 623 N.W.2d 78, 81; *State v. Goodroad*, 1997 SD 46, ¶ 10, 563 N.W.2d 126, 130). In *State v. Jones*, we elaborated:

> The *res gestae* embraces matters and statements immediately antecedent to, and having a causal connection with, the main transaction. The *res gestae* as applied to a crime, includes the complete criminal transaction from its beginning or starting point in the act of accused until the end is reached. Continuing acts or a series of events, transpiring before the commission of the crime, and which lead up to and are necessary or helpful to an understanding of the main event, and tend to explain the conduct and purposes of the parties are admissible as part of the *res gestae*.

2002 SD 153, ¶ 15, 654 N.W.2d 817, 820 (quoting *State v. Burtts*, 81 S.D. 150, 155, 132 N.W.2d 209, 211–212 (1964)) (emphasis added).

[¶ 21.] Pasek's complete criminal transaction began with his escape and vehicle theft on June 29 and ended with the First Western bank robbery and second vehicle theft on June 30. The statements at issue occurred while Starr was in the first stolen vehicle having a conversation with Pasek about his plans to rob the bank. Because Starr's testimony "embraced ... statements immediately antecedent to ... the main transaction," and because Pasek's

submissions lead up to, and were helpful to an understanding of the bank robbery and car thefts, they were properly admitted as *res gestae*. *See id.*

[¶ 22.] We finally note that the questions asked by the prosecutor were limited to Pasek's "plan" to rob the bank. Because the questions only appear to attempt to elicit Pasek's plan to rob the bank, they were not attempts to elicit inadmissible other acts evidence of character. Evidence of Pasek's plan to rob the bank was admissible as an exception to the general rule against use of character evidence. *See* SDCL 19–12–5 (Rule 404(b)).

[¶ 23.] The trial court did not abuse its discretion in denying Pasek's motion for a mistrial.

### Habitual Offender–Three Prior Felonies

[¶ 24.] The trial court determined that Pasek had committed three prior felonies, one involving a crime of violence. He was, therefore, sentenced to life imprisonment as a habitual offender under SDCL 22–7–8. Pasek contends the trial court erred in applying the habitual offender sentencing enhancement because he claims that he only had two prior convictions within the meaning of SDCL 22–7–9.

[¶ 25.] Pursuant to SDCL 22–7–8,[8] if a defendant has three or more previous felony convictions, including at least one crime of violence,[9] "the sentence for the principal

---

7. This Court has stated that "evidence of 'other acts' may be admissible as res gestae evidence, ... an exception to SDCL 19–12–5 or Federal Rule 404(b)." *Id.*

8. SDCL 22–7–8 provides:
   If a defendant has been convicted of three or more felonies in addition to the principal felony and one or more of the prior felony convictions was for a crime of violence as defined in subdivision 22–1–2(9), the sentence for the principal felony shall be enhanced to the sentence for a Class 1 felony.

9. A crime of violence is defined in 22–1–2(9), which provides:
   "Crime of violence," any of the following crimes or an attempt to commit, or a conspiracy to commit, any of the same: murder, manslaughter, rape, criminal pedophilia, aggravated assault, riot, robbery, burglary in the first or second degree, arson, kidnapping, felony sexual contact as defined in 22–22–7 and 22–22–19.1, felony child abuse as defined in 26–10–1, or any other felony in the commission of which

felony shall be enhanced to the sentence for a Class 1 felony." However, prior convictions are limited to one prior conviction arising from each "transaction." SDCL 22–7–9.[10]

[¶ 26.] It is uncontested that Pasek was convicted of one state felony arising from a shoplifting transaction on April 16, 1997. It is also uncontested that Pasek was convicted in federal court on August 28, 2002 of seven federal felony counts:

(1) Conspiracy to commit bank robbery;

(2) Bank robbery and aiding and abetting bank robbery;

(3) Use of a firearm during and in relation to a crime of violence and aiding and abetting use of a firearm during and in relation to a crime of violence;

(4) Use of a firearm during and in relation to a crime of violence and aiding and abetting use of a firearm during and in relation to a crime of violence;

(5) Theft of firearms and aiding and abetting theft of firearms;

(6) Conspiracy to use firearms during and in relation to a crime of violence;

(7) Felon in possession of a firearm.

The dispute here concerns the number of transactions (and thus convictions) involved in these seven felonies.

[¶ 27.] The trial court determined that the seven felonies arose from four separate transactions, one involving a crime of violence. The trial court itemized the transactions as follows:

(1) The crime of bank robbery [in Casper, Wyoming on March 9, 2002, which] was a distinct felony and it was a crime of violence;

(2) The offense of felony possession of a firearm is a distinct offense and a felony;

(3) The theft of the firearms from the pawn shop [in Gillette, Wyoming on March 8, 2002] is a distinct felony from the use of firearms or possession of the firearms and a distinct felony from the bank robbery;

(4) The conspiracy charge.

[¶ 28.] Pasek contends that the trial court improperly found four separate transactions because he believes that all of the felonies were related to one conspiracy/bank robbery transaction. Pasek relies upon *State v. Flittie*, 318 N.W.2d 346 (S.D. 1982) (*Flittie I*) and *State v. Flittie*, 425 N.W.2d 1 (S.D.1988) (*Flittie II*). However, only *Flittie II* involved the habitual offender statute at issue here.[11] In *Flittie II*, this Court concluded that because the "conviction on the conspiracy charge was based on the same post-murder conduct as the accessory after the fact charge," the convictions could not be considered separate convictions for the purposes of SDCL 22–7–9. *Id.* at 2. Based upon this precedent, both federal conspiracy charges would be based on the same conduct as the federal robbery, and therefore, the conspiracy charges could not have arisen from a separate transaction. We must next consider whether the five remaining felonies,

the perpetrator used force, or was armed with a dangerous weapon, or used any explosive or destructive device.

**10.** SDCL 22–7–9 provides

A prior conviction may not be considered under either 22–7–7 [conviction of one or two prior felonies] or 22–7–8 [conviction of three or more felonies] unless the defendant was, on such prior conviction, discharged from prison, jail, probation, or parole within fifteen years of the date of the commission of the principal offense. In addition, only one prior conviction arising from the same transaction may be considered.

**11.** *Flittie I* involved the question of double jeopardy.

occurring over a span of two days, were also part of that same conduct.

[¶ 29.] In interpreting a prior version of a related statute on sentence enhancement, SDCL § 22–6–6.1 (consecutive/concurrent sentences), we noted that "[t]here is no definition of separate transactions in the criminal statutes . . . ." *State v. Sieler*, 1996 SD 114, ¶ 16, 554 N.W.2d 477, 481. We analyzed that case by looking at single or multiple acts. *Id.* ¶ 18. We observed that, "when the 'transaction' consists of two or more criminal acts, the fact that the two are 'successive' does not require the conclusion that they have merged." *Id.* (citation omitted) (concluding that burglary, attempted first-degree murder, rape, kidnapping, and aggravated assault of a single victim on a single night in the same residence were separate transactions). We found separate transactions in *Sieler* because "Sieler's crimes were each distinct separate acts that were completed before the next act began . . . ." *Id.* ¶ 19. Thus, under *Flittie* II and *Sieler* we must examine the five remaining non-conspiracy convictions to determine whether they were based upon the same conduct or whether they were distinct, separate acts, each completed before the next act began.

[¶ 30.] Pasek's federal robbery conviction occurred one day after the theft of firearms conviction. These two offenses also occurred more than 150 miles apart. Therefore, Pasek's theft of firearms on March 8, 2002 in Gillette involved different conduct and was a distinct, separate act that was completed before the bank robbery in Casper on March 9, 2002. Thus, those two convictions arose from separate transactions. However, possession of a firearm involved the same conduct and was not a distinct, separate act from the theft of the firearm or the robbery. Therefore, the federal possession of a firearm charges did not arise out of a separate transaction.

[¶ 31.] This leaves Pasek with eight state and federal convictions arising from three separate transactions, namely: the felony shoplifting in 1997, the March 8, 2002 theft of firearms in Gillette, and the March 9, 2002 bank robbery in Casper. Consequently, the trial court did not err in finding three prior felony convictions.[12]

### Cruel and Unusual Punishment

[¶ 32.] Pasek argues that "the facts of this case do not equate to the most severe example of [f]irst[-d]egree [r]obbery," and he should not have been given the most severe sentence that could be imposed. He also contends that his sentence of life imprisonment was grossly disproportionate and constituted cruel and unusual punishment under the Eighth Amendment.

[¶ 33.] This Court employs limited constitutional review of sentences. *State v. Garber*, 2004 SD 2, ¶ 28, 674 N.W.2d 320, 327 (citing *State v. Milk*, 2000 SD 28, ¶ 14, 607 N.W.2d 14, 18). Among the limiting principles are "substantial deference to the legislature's broad authority to determine the types and limits of punishment" and the notion that "the Eighth Amendment does not mandate adoption of any one penological theory." *Milk*, 2000 SD 28, ¶ 14, 607 N.W.2d at 18 (citing *State*

12. We also see no prejudicial error even if the federal convictions only constituted one transaction. SDCL 22–7–7, another enhancement statute, provides the same effective enhancement in this case for one prior felony. It provides that with one prior felony conviction "the sentence for the principal felony shall be enhanced by changing the class of the principal felony to the next class which is more severe." Because Pasek's principal felony of first degree robbery was a Class 2 felony, enhancement to the next more severe class required an enhancement to a Class 1 felony, the same as under SDCL 22–7–8 and 22–7–9.

*v. Hinger,* 1999 SD 91, ¶ 16, 600 N.W.2d 542, 547 (citations omitted)). We also rarely disturb sentences within the statutory maximum. *State v. Stahl,* 2000 SD 154, ¶ 5, 619 N.W.2d 870, 871–872 (citations omitted).

[¶ 34.] Our precise standard of review is well settled:

> [T]o assess a challenge to proportionality we first determine whether the sentence appears grossly disproportionate. To accomplish this, we consider the conduct involved, and any relevant past conduct, with utmost deference to the Legislature and the sentencing court. If these circumstances fail to suggest gross disproportionality our review ends. If, on the other hand, the sentence appears grossly disproportionate, we may, in addition to examining the other *Solem* factors, conduct an intra- and inter–jurisdictional analysis to aid our comparison or remand to the circuit court to conduct such comparison before resentencing. We may also consider other relevant factors, such as the effect upon society of this type of offense.

*State v. Herrmann,* 2004 SD 53, ¶ 26, 679 N.W.2d 503, 511 (quoting *State v. Bonner,* 1998 SD 30, ¶ 17, 577 N.W.2d 575, 580; citing *Harmelin v. Michigan,* 501 U.S. 957, 1000, 111 S.Ct. 2680, 2704, 115 L.Ed.2d 836, 868 (1991)).

[¶ 35.] Pasek's life sentence fell within the range the Legislature authorized in SDCL 22–30–7, 22–7–8 and 22–6–1(3). Pasek, however, contends that the sentencing court did not sufficiently consider rehabilitation prospects under *Bonner,* 1998 SD 30, 577 N.W.2d 575. We disagree because the record reflects that Judge Johnson did consider rehabilitation. Judge Johnson noted that Pasek was an "unusual criminal defendant" and that he was the type of person that would rather be on the run and have the excitement of committing a crime than leading a normal life. Judge Johnson specifically stated that "[Pasek's] plan for rehabilitation will be to figure out how to get out of prison," further stating that Pasek had to have the excitement of committing crimes, trying to avoid capture, and then when captured, trying to escape and seeing how long before he was captured again. Thus, although it was not favorable to Pasek, Judge Johnson clearly considered rehabilitative prospects in formulating a sentence.

[¶ 36.] In addition, we can see why the trial court believed that Pasek was a poor prospect for rehabilitation. In just this series of events, Pasek escaped while in custody for a bank robbery, stole two cars, announced his intent to rob another bank, and then carried through with his plan. Moreover, when asked if there was anything he wished to say at sentencing, he told the court that he felt "some sort" of regret for what he did. He further conceded "I get off on the rush-on the rush of doing things, obviously, from my criminal record."

[¶ 37.] That criminal record reflects that in 1997, at the age of 18, he was convicted of felony shoplifting. In 1998, he violated probation and his sentence was reimposed. In 2002, he was convicted of seven offenses involving conspiracy to commit bank robbery, bank robbery, use of a firearm in a crime of violence, theft of firearms, conspiracy to use firearms in a crime of violence, and felony possession of firearms. Then, while in jail in Wyoming as a federal prisoner, he escaped and fled to Bozeman, Montana, where he robbed another bank. Pasek then escaped from jail in Bozeman, stole a vehicle there, and committed the South Dakota offenses. Finally, there was evidence that he considered an even more dangerous escape attempt before his South Dakota trial. In planning that escape, he stated to the jail

staff "I've escape[d] twice before, you don't think I can escape from here. I am now more desperate and I'll take hostages next time." Considering all of this conduct with utmost deference to the Legislature and the sentencing court, we see no gross disproportionality.

[¶ 38.] Although our analysis generally ends here, we also address Pasek's contention that the trial court did not have adequate information to sentence him because it failed to order a presentence investigation. A presentence investigation may be ordered in the discretion of the court. However, in this case Pasek specifically waived his right to a presentence investigation. Therefore, the court was not required to order one. SDCL 23A–27–5.[13] Nevertheless, Pasek argues that the failure to order the presentence investigation was an abuse of discretion.

[¶ 39.] Pasek concedes that he waived his presentence investigation, but he argues that "the trial court is empowered to order such an investigation and this is an example of a case where such an order should have been implemented" because it would have disclosed other evidence. We reject this argument. Obviously, trial courts can only make sentencing decisions—including orders for presentence investigations—based upon the evidence that is presented through trial advocacy. Pasek, however, foreclosed that possibility by waiving his right to present the "other" information either through testimony, offer

of proof, or through a presentence investigation. Under those circumstances, this Court will not surmise that such mitigating information even exists. Therefore, we find no abuse of discretion in failing to order a presentence investigation when such an investigation is waived by a defendant and the defendant has failed to identify the mitigating evidence that might have been disclosed.

[¶ 40.] Affirmed.

[¶ 41.] GILBERTSON, Chief Justice, and KONENKAMP, Justice, concur.

[¶ 42.] SABERS and MEIERHENRY, Justices, concur in part and dissent in part.

SABERS, Justice (concurring in part, dissenting in part).

[¶ 43.] I dissent on the punishment approved in Issue 4 because:

**A LIFE SENTENCE WITHOUT THE POSSIBILITY OF PAROLE ELIMINATES FOREVER ANY OPPORTUNITY FOR HOPE, SELF–IMPROVEMENT, AND REHABILITATION.**

[¶ 44.] A life sentence should only be imposed when a trial court "can determine from the facts of the principal offense and the previous convictions that rehabilitation is so unlikely as to be removed from consideration in sentencing; that the interests of society demand that the convict be kept off the streets for the rest of his life ... and that the life sentence not constitute

---

13. SDCL 23A–27–5 provides:

A presentence investigation may be ordered in the discretion of a court. The court services officer of a court shall make a presentence investigation and report to the court before the imposition of sentence or the granting of probation unless, with the permission of the court, the defendant waives a presentence investigation and report, or the court finds there is in the record information sufficient to enable the

meaningful exercise of sentencing discretion, and the court explains this finding on the record.

The report shall not be submitted to a court or its contents disclosed to anyone unless the defendant has pleaded guilty or nolo contendere or has been found guilty, except that a judge may, with the written consent of the defendant, inspect a presentence report at any time.

excessive retribution." *State v. Pulfrey,* 1996 SD 54, ¶ 18, 548 N.W.2d 34, 38 (internal citations omitted). Here, the principal offense and the previous convictions do not show "that rehabilitation is so unlikely as to be removed from consideration in sentencing." *Id.*

[¶ 45.] Life imprisonment for Pasek's crimes is the maximum and most severe sentence that could be imposed. SDCL 22–30–7; SDCL 22–6–1; SDCL 22–7–8. These crimes and prior convictions are not of such magnitude to justify a lifetime of incarceration without the possibility of parole. These crimes were committed in a nonviolent manner. There was no physical injury or overt threat to injure anyone. Pasek neither damaged nor destroyed any property in the commission of his crimes. Although the bank teller who gave him the marked bills was in fear, he did not otherwise harm her. While Pasek's crimes and prior convictions are very serious, they do not rise to the level that "the interests of society demand that the convict be kept off the streets *for the rest of his life.*" *Pulfrey,* 1996 SD 54, ¶ 18, 548 N.W.2d at 38 (emphasis added).

[¶ 46.] Even though Pasek's principal offense and previous convictions permit a life sentence, we should heed the argument of his attorney:

Certainly, rehabilitation is possible with this young man [ ]. He is an immature 25 years of age. Nevertheless, he has the intellectual capacity to overcome a history of largely untreated attention deficit disorder, to mature past his penchant for adrenalin, and become a safe and productive member of society after a significant period of incarceration. The nightmare of the sentence to this young man is that he will have no incentive to improve himself or modify his behavior.

Appellant's Brief, p. 24.

[¶ 47.] As Justice Amundson stated in 2000:

[t]he only medicine to help in changing or rehabilitating any individual seems to be the 'hope' that he or she can again obtain their freedom by amending their attitude and ways. There should generally be a light at the end of the tunnel for any human no matter how bad he appears or how bad his past conduct reflects he is . . . . It seems as though the result of this sentence is to cast this individual into the human waste dump and let him languish there until he finally totally decomposes and has gasped his last breath.

*Ganrude v. Weber,* 2000 SD 96, ¶ 29, 614 N.W.2d 807, 813 (Amundson, J. dissenting).

[¶ 48.] "The sentencing court should also consider rehabilitation prospects." *State v. Bonner,* 1998 SD 30, ¶ 19, 577 N.W.2d 575, 580. Although neither Pasek nor his attorney provided any real evidence of any redeeming social value, we should assume that this young man has some potential to develop some redeeming social value given the opportunity. The rehabilitation programs available to the defendant while incarcerated, along with the natural maturation process, should provide him the opportunity to learn and become a better person.

[¶ 49.] We should reverse and remand this life sentence without the possibility of parole to the trial court for a meaningful *less* than life sentence. Yes, the word *"meaningful"* modifies the word *"less."* A meaningful less than life sentence should be comparable to one's life expectancy. For example, this man is 25 years old with a life expectancy in the mid 80's. Therefore, anything exceeding 50–60 years denies him a real reason to work towards learning, self-improvement, and rehabilitation. Where required, we must insure that sentencing allows for some hope.

[¶ 50.] While Pasek should be punished for the serious crimes he has committed, it is beneath our society to just close the book on him under these circumstances. Therefore, I would reverse and remand on Issue 4 to direct the trial court to impose a meaningful *less* than life sentence in accordance with this dissent.

[¶ 51.] MEIERHENRY, Justice, joins this special writing.